# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

*In re Marriage of Kehoe*, 2012 IL App (1st) 110644

---

| | |
|---|---|
| Appellate Court Caption | *In re* MARRIAGE OF LAURETTA L. KEHOE, Petitioner-Appellant, and FRANK L. FARKAS, Respondent-Appellee. |
| District & No. | First District, Sixth Division<br>Docket No. 1-11-0644 |
| Filed | March 16, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Where the judgment entered in the parties' marriage dissolution proceedings incorporated a marital settlement agreement and qualified domestic relations order based on their agreement that petitioner would be entitled to one-half of the value of respondent's pension from the police department where he was employed from the date of his employment to the date of the parties' separation, but the pension fund subsequently informed petitioner that it could pay benefits only on a court-entered qualified Illinois domestic relations order and was not required to honor the QDRO, the trial court's refusal to grant petitioner's motion for the entry of a QILDRO and the denial of her motion for reconsideration were affirmed, since the trial court could not enter a QILDRO that was not in accordance with the binding provisions of the original QDRO, but the cause was remanded for the entry of an appropriate QILDRO based on the terms of the settlement agreement and the original QDRO. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 86-D-8821; the Hon. LaQuietta J. Hardy-Campbell, Judge, presiding. |

| Judgment | Affirmed and remanded with instructions. |
|----------|------------------------------------------|
| Counsel on Appeal | Jerome Marvin Kaplan and C. Robert Black, both of Chicago, for appellant. |
| | Paul J. Bargiel, of Paul J. Bargiel, P.C., of Chicago, for appellee. |
| Panel | PRESIDING JUSTICE R. GORDON delivered the judgment of the court, with opinion. |
| | Justice Lampkin concurred in the judgment and opinion. |
| | Justice Garcia dissented, with opinion. |

## OPINION

¶ 1    Petitioner, Lauretta L. Kehoe, f/k/a Lauretta L. Farkas, filed a complaint for a dissolution of her marriage against respondent, Frank L. Farkas, her husband of six years. In 1988, a judgment of dissolution of marriage was entered with a marital settlement agreement and qualified domestic relations order (QDRO) incorporated into the judgment. As part of their settlement agreement, the parties agreed that Lauretta shall be entitled to one-half of the value of Frank's pension from the date of his employment with the Village of Schiller Park as a police officer to the date of the separation of the parties.

¶ 2    Upon Frank's retirement, Lauretta was subsequently informed by the Schiller Park Police Pension Fund that they only pay pension benefits based on a court-entered qualified Illinois domestic relations order (QILDRO) and are not required to honor Lauretta's QDRO.

¶ 3    On January 14, 2010, Lauretta filed a motion for entry of a QILDRO along with a proposed order directing respondent to sign his consent to the QILDRO. The motion and proposed QILDRO set forth a method of calculation for determining the value of the marital portion of Frank's pension. After a postjudgment hearing on June 2, 2010, where Frank objected to Lauretta's proposed calculation of pension benefits, the trial court entered a written order denying Lauretta's motion for entry of a QILDRO.

¶ 4    After conducting several hearings and receiving memoranda of law from both parties, the trial court subsequently denied Lauretta's motion to reconsider on February 18, 2011.

¶ 5    Lauretta appeals, arguing the trial court erred in refusing to grant the motion for entry of a QILDRO and denying her motion for reconsideration. We affirm.

¶ 6                                    BACKGROUND

¶ 7         The parties were married on April 28, 1979, and separated on or about August 31, 1985. On December 28, 1988, the trial court entered a judgment dissolving the marriage. At the time of dissolution, there was one minor child born to the parties, James Francis Farkas, age 5, and one minor child adopted by the parties, Katharine Anne Farkas, age 13. Lauretta received sole care, custody, control, and education of the minor children with reasonable visitation granted to Frank.

¶ 8         A marriage settlement agreement was incorporated in the dissolution judgment and provided for the custody, support, visitation schedules, and expenses of the parties' minor children and settlement of property rights. The marriage settlement agreement included a section addressing the division of Frank's pension. The marriage settlement states:

> "The parties agree that LAURETTA shall be entitled to receive one half of the value of the pension from the date of FRANK's employment with the Village of Schiller Park to the date of the separation of the parties, which is August 31, 1985 (hereinafter referred to as 'one-half').
>
> *** FRANK further understands that a Qualified Domestic Relations Order reflecting the above shall be lodged with the Schiller Park Police Pension Fund directing them and ordering them to pay one-half (1/2) of FRANK'S pension to LAURETTA commencing at the time of FRANK'S retirement or termination of employment from the Village of Schiller Park. The right of LAURETTA to receive FRANK'S one-half (1/2) pension shall not survive after LAURETTA'S death."

A QDRO was also incorporated in the judgment. The QDRO identifies the amount of Frank's pension that is payable to Lauretta and specifies the manner in which the amount is to be determined. The QDRO directs and orders the Schiller Park Police Pension Fund to distribute the amount agreed upon in the parties' marriage settlement agreement. The court did not place a present value on Frank's pension at the time of the dissolution, and neither the marriage settlement agreement nor the QDRO estimated how much the pension was worth at the time of separation between the two parties. The QDRO provides:

> "The interest in the Husband's name in the SCHILLER PARK POLICE PENSION FUND (hereinafter referred to as 'PLAN') or successor, shall be divided between the parties as follows:
>
> * * *
>
> (v.) Marital Portion: An amount equal to the balance in the Husband's account (in the case of a defined contribution plan) and/or the amount accumulated by the Husband under the terms of the plan (in the case of a defined benefit plan) for each Plan multiplied by a fraction, the numerator of which is the number of years (months) of marriage during which benefits were accumulated prior to the 'Marital Retirement Date', aforesaid, and the denominator of which is the total number of years (months) during which benefits were accumulated prior to the marital retirement date.
>
> * * *
>
> 3. Benefit Due Wife: Types–Formula: The Wife's share of the marital portion of each

-3-

Plan shall be determined in accordance with the type of benefits available and shall be calculated and distributed to her pursuant to the following:

(i.) Monthly or Other Periodic Disbursement of Benefits: To the extent that the disbursement of benefits to the Husband pursuant to either Plan can only be made on a monthly or other regular periodic basis, then the Wife shall be entitled to receive an amount equal to one-half (1/2) of the 'marital portion' (as defined hereinabove) of each such monthly periodic payment.

* * *

5. Increased Benefits: Any increases in the Husband's accrued benefits in either Plan caused by contributions occurring subsequent to the marital retirement date are not to be construed as part of the marital portion. Accordingly such increases shall be disbursed to and enjoyed solely by the Husband and the Wife shall not be entitled to share in any such increases.

* * *

13. Savings Clause: It is the intention of the Wife and Husband that the foregoing provisions shall qualify as a Qualified Domestic Relations Order and whenever the provisions hereunder are inconsistent with the definition of a Qualified Domestic Relations Order as may be contained, from time to time, in the Internal Revenue Code of 1954, as amended, and/or the Employee Retirement Security Act of 1974, as may or may not be amended, this Agreement shall be amended from time to time as may be necessary to comply with the requirements for a Qualified Domestic Relations Order. Both parties shall enter into an agreed order of court as may be reasonably required to amend this Article and/or the Judgment for Dissolution of Marriage to so comply."

¶ 9    Frank retired from the Village of Schiller Park police department effective November 17, 2009. Following Frank's retirement, the Schiller Park Police Pension Fund contacted Lauretta and informed her that because of a change in Illinois law, Illinois police pension funds only pay pension benefits based on a court-entered QILDRO and are not required to honor Lauretta's QDRO.2

¶ 10    Lauretta sent a QILDRO consent form to Frank, which Frank refused to sign. Lauretta subsequently filed a motion for entry of a QILDRO and finding of consent on January 14, 2010. In the QILDRO, Lauretta named herself as alternate payee and recipient for 50% of the marital portion of Frank's pension. The QILDRO uses a formula to calculate the marital portion benefit:

The amount of the alternate payee's benefit shall be the result of (A/B) x C x D where:

" 'A' equals the number of months of regular plus permissive service that the member accumulated in the Retirement System from the date of marriage (04-28-1979) to the date of the divorce (12-23-1988). ***

'B' equals the number of months of regular plus permissive service that the member accumulated in the Retirement System from the time of initial membership in the Retirement System through the member's effective date of retirement. ***

'C' equals the gross amount of *** the member's monthly retirement benefits ***

calculated as of the member's effective date of retirement including permissive service, upgrades purchased, and other benefit formula enhancements. ***

> 'D' equals the percentage noted in Section III(A)(2) [50% per month of the marital portion of the pension]."

¶ 11    At a postjudgment hearing on June 2, 2010, Lauretta argued that the trial court should grant her motion for entry of a QILDRO. Lauretta's proposed QILDRO set forth a formula which calculated Lauretta's pension benefits by dividing Frank's pension as of the date the pension went into pay status as opposed to the date set forth in the judgment and QDRO. Frank objected to Lauretta's method of pension apportionment and argued that she is only entitled to one-half the value of the pension from the date of marriage until the date of dissolution. The trial court entered a written order denying Lauretta's motion for entry of a QILDRO and ordered Frank to pay Lauretta 50% of his pension as of the date of separation:

> "Respondent pursuant to the order and judgment for dissolution of marriage shall pay to Petitioner 50% the pension as of the date of separation which is 8/31/85. Said calculation is Petitioner's marital portion."

¶ 12    Lauretta subsequently filed a motion to reconsider on June 14, 2010. After both parties submitted memorandums of law, the trial court denied Lauretta's motion to reconsider at a hearing on February 18, 2010.

¶ 13    This appeal followed.

¶ 14                                ANALYSIS

¶ 15    On appeal, Lauretta argues the trial court erred in denying both her motion for entry of a QILDRO and her subsequent motion for reconsideration. Specifically, Lauretta contends that because of a change in Illinois pension law that effectively voids the QDRO which was incorporated in the parties' judgment for dissolution of marriage, the trial court should have entered a QILDRO in its place and employed the reserved jurisdiction approach to calculate the marital portion Frank's pension. We conclude that the trial court did not err in its decision and affirm but remand with instructions.

¶ 16                I. The Parties' Marital Settlement Agreement and QDRO

¶ 17                            A. Standard of Review

¶ 18    The parties do not dispute that they agreed to the division of Frank's pension benefits in their marital settlement agreement and QDRO. As a result, the terms of the marital settlement agreement are binding on the parties and the court. See 750 ILCS 5/502(b) (West 2008); *Blum v. Koster*, 235 Ill. 2d 21, 32 (2009). The terms of a marital settlement agreement are interpreted in the same manner as a contract. *Blum*, 235 Ill. 2d at 33; *In re Marriage of Carrier*, 332 Ill. App. 3d 654, 659 (2002). The main objective of the court's analysis is to give effect to the purpose and intent of the parties at the time they entered into the agreement. *In re Marriage of Davis*, 286 Ill. App. 3d 1065, 1066 (1997). Like a contract, the marital settlement agreement should be given a fair and reasonable interpretation based upon all of its language and provisions. *Carrier*, 332 Ill. App. 3d at 662 (O'Malley, J., dissenting). The

interpretation of a marital settlement agreement is reviewed *de novo* as a question of law. *Blum*, 235 Ill. 2d at 33. *De novo* consideration means we perform the same analysis that a trial judge would perform and give no deference to the judge's conclusions or specific rationale. *Khan v. BDO Seidman, LLP*, 408 Ill. App. 3d 564, 578 (2011).

¶ 19                    B. Judgment Includes Clear Method of Pension Apportionment

¶ 20     The marital settlement agreement between the parties addresses how Frank's pension benefits should be divided by stating: "The parties agree that LAURETTA shall be entitled to receive one half of the value of the pension from the date of FRANK'S employment with the Village of Schiller Park to the date of the separation of the parties, which is August 31, 1985 (hereinafter referred to as 'one-half')." If the parties' judgment included only this provision and no other language or additional documents such as a QDRO, the judgment may have been viewed as "silent as to what portion of the pension benefit is marital" and the trial court would then have the discretion to decide how to allocate the pension benefits. *In re Marriage of Richardson*, 381 Ill. App. 3d 47, 53 (2008); *In re Marriage of Wisniewski*, 286 Ill. App. 3d 236, 243 (1997).

¶ 21     However, the marital settlement agreement and QDRO in the case at bar already set out the method of calculation and pension apportionment. The parties' QDRO explains that Frank's pension plan should be "multiplied by a fraction, the numerator of which is the number of years (months) of marriage during which benefits were accumulated prior to the 'Marital Retirement Date', aforesaid, and the denominator of which is the total number of years (months) during which benefits were accumulated prior to the martial retirement date." The term "Marital Retirement Date" referred to the date when the final judgment of dissolution was entered and its definition was used "for the sole purpose of computing the marital purpose" of Frank's pension plan.

¶ 22     The detail of the QDRO's language regarding the calculation of Frank's pension and, even more notably, the very act of incorporating a completed QDRO into the dissolution judgment show that the judgment is not "silent" as to how the pension should be divided and what portion of the pension benefit is marital. *Richardson*, 381 Ill. App. 3d at 53. The parties clearly agreed upon a formula for calculating the pension apportionment during the time of dissolution. By incorporating a QDRO within the judgment, the trial court had already directed and ordered the Schiller Park Police Pension Fund to pay to Lauretta her share of the pension benefits upon Frank's retirement. Entering a QDRO at the time of dissolution would be meaningless if the trial court actually intended for the marital portion of Frank's pension to be determined at a later time.

¶ 23                              C. Increased Benefits Provision

¶ 24     The "increased benefits" provision within the QDRO also demonstrates that the dissolution judgment included a method of dividing Frank's pension between the parties. The provision states: "Any increases in the Husband's accrued benefits in [the pension plan] caused by contributions occurring subsequent to the marital retirement date are not to be construed as part of the marital portion. Accordingly such increases shall be disbursed to and

enjoyed solely by the Husband and the Wife shall not be entitled to share in any such increases." It is difficult to adopt Lauretta's proposed method of calculating her share of the pension benefits without directly violating the terms of this provision.

¶ 25 Lauretta argues that the trial court should adopt the reserved jurisdiction approach, or the *Hunt* formula (*In re Marriage of Hunt*, 78 Ill. App. 3d 653 (1979)), to calculate her share of the pension benefits. *Richardson*, 381 Ill. App. 3d at 52. Under this method, Lauretta would be entitled to 50% of the benefits as accrued during Frank's entire term of employment, in proportion to the number of years such benefits accrued during the marriage. *Richardson*, 381 Ill. App. 3d at 52. This approach would allow Lauretta to benefit from the entire growth in value between the date of dissolution and the date of Frank's retirement. Clearly, this method of calculation would violate the direct terms of the QDRO which prohibit Lauretta from being entitled to any "increases in the Husband's accrued benefits in [the pension plan] caused by contributions occurring subsequent to the marital retirement date."

¶ 26 When the language of the agreement between the parties "is clear and its meaning is unambiguous, courts must give effect to that language." *In re Marriage of Schurtz*, 382 Ill. App. 3d 1123, 1125 (2008) (citing *Davis*, 286 Ill. App. 3d at 1066). The language of the "increased benefits" provision in the QDRO is clear and can only mean that Lauretta is not entitled to the increased benefits resulting from Frank's later contributions to his pension plan after the date of dissolution. As a result, Lauretta's pension benefits must be calculated based on the value of the pension at the time of dissolution, not at the time of Frank's retirement.

¶ 27 II. *Richardson* Is Distinguishable and Does Not Apply Here

¶ 28 Lauretta also argues on appeal that the trial court failed to follow established case law, namely *Richardson*, when it refused to employ the reserved jurisdiction approach to calculate Lauretta's portion of the pension benefits. The trial court did not err in its decision because *Richardson* is clearly distinguishable from the case at bar.

¶ 29 In *Richardson*, the trial court did not abuse its discretion when it selected the reserved jurisdiction approach to calculate the former wife's share of her former husband's pension benefits. The trial court had the discretion to " 'devise a method' " of apportionment because the parties' judgment for dissolution was "silent" on how the marital portion would be calculated. *Richardson*, 381 Ill. App. 3d at 53 (quoting *Wisniewski*, 286 Ill. App. 3d at 243). The reserved jurisdiction approach, or the *Hunt* formula, is a commonly used method for dividing pensions' marital portions where the marital interest in a pension benefit is determined by dividing the number of years or months of marriage during which pension benefits accumulated by the total number of years or months benefits accumulated prior to retirement or being paid. *Richardson*, 381 Ill. App. 3d at 52. The value of the marital interest is then calculated by multiplying the amount of each benefit payment as it is disbursed by the marital interest percentage. *Richardson*, 381 Ill. App. 3d at 52. Even though the reserved jurisdiction approach was a reasonable method for calculating the marital portion of the pension benefits in cases where it was difficult to place a present value on a pension due to uncertainties regarding vesting or maturation, *Richardson* does not apply here. *Richardson*,

381 Ill. App. 3d at 54.

¶ 30    First, *Richardson* is only relevant in cases where the judgment of dissolution is "silent" on how the marital portion of the pension benefits is to be calculated. *Richardson*, 381 Ill. App. 3d at 53. In *Richardson*, the judgment stated nothing more than that the former wife was awarded one-half of the marital portion of the pension and did not state how the marital portion would be calculated. *Richardson*, 381 Ill. App. 3d at 53. *In re Marriage of Culp*, another case Lauretta relies on, also involved a settlement agreement which "contain[ed] no explicit language directing the trial court how to divide the marital portion of the pension other than to do so 'equally.' " *In re Marriage of Culp*, 399 Ill. App. 3d 542, 552 (2010).

¶ 31    In contrast to *Richardson* and *Culp*, the judgment in the case at bar incorporated a QDRO that includes specific language detailing the marital retirement date and a formula for calculating the marital portion of pension benefits. The parties' QDRO also explicitly prohibits Lauretta from sharing in any increases in Frank's accrued benefits caused by contributions made after the date of dissolution. The judgment in *Richardson* and settlement agreement in *Culp* did not include a similar provision or such restrictive language as the QDRO did here. These differences clearly demonstrate that the judgment in the case at bar was not "silent" in regard to the method of pension apportionment. As a result, *Richardson* does not control here because the trial court did not have the "discretion" to decide how to calculate the pension benefits and was precluded from using the reserved jurisdiction approach. *Richardson*, 381 Ill. App. 3d at 53.

¶ 32    Second, the trial court in *Richardson* was able to choose the reserved jurisdiction approach because the judgment expressly indicated that the court shall retain jurisdiction for the purpose of later entering a QDRO. *Richardson*, 381 Ill. App. 3d at 52. The court interpreted the judgment to mean "by reserving jurisdiction to enter an allocation order, the court also reserved jurisdiction to determine the calculation of that allocation." *Richardson*, 381 Ill. App. 3d at 53. The case at bar differs from *Richardson* in that a QDRO was incorporated into the judgment at the time of the dissolution. The trial court did not retain jurisdiction to allocate the pension benefits because a QDRO had already set forth the calculation of the marital portion of the pension when judgment was entered. Again, *Richardson* does not apply because the trial court does not have the discretion to decide on a method of pension apportionment when the judgment has already done so through the parties' QDRO.

¶ 33                              III. The QILDRO Statute

¶ 34    Lauretta also contends the trial court's order violates the Illinois Pension Code (40 ILCS 5/1-101 *et seq.* (West 2008)). Essentially, Lauretta argues that the trial court should have entered a QILDRO based on the reserved jurisdiction approach in order to comply with the Illinois Pension Code. Effective July 1, 1999, the legislature amended certain sections of the Pension Code and the Illinois Marriage and Dissolution of Marriage Act (750 ILCS 5/101 *et seq.* (West 2000)), to give Illinois domestic relations courts the statutory authority to direct payment of governmental pension benefits to a person other than the regular payee. *Smithberg v. Illinois Municipal Retirement Fund*, 192 Ill. 2d 291, 301 (2000). After the

amendment, a domestic relations order that directs the division and payment of pension benefits that was issued by a court but not implemented by a retirement system prior to the amendment is rendered void. 40 ILCS 5/1-119(*l*)(2) (West 2000). However, the individual who is the alternate payee of the voided domestic relations order can petition the court for an amended order, such as a QILDRO, which complies with the amended statute. See 40 ILCS 5/1-119(*l*)(2) (West 2000).

¶ 35     Lauretta argues that since the amendment and change in the Pension Code rendered her QDRO void, the savings clause of the QDRO is triggered and requires the trial court to enter a QILDRO to effectuate the provisions of the original QDRO. The savings clause states that the "Agreement shall be amended from time to time as may be necessary to comply with the requirements for a Qualified Domestic Relations order. Both parties shall enter into an agreed order of court as may be reasonably required to amend this Article and/or the Judgment for Dissolution of Marriage to so comply."

¶ 36     The trial court did not refuse to comply with the QDRO's savings clause when it denied Lauretta's motion for entry of a QILDRO, because her QILDRO did not comply with the method of apportionment agreed upon in the parties' marital settlement agreement and QDRO. The terms of the martial settlement agreement and QDRO are binding upon the court, and the trial court cannot enter a QILDRO if it is not in accordance with the provisions of the original QDRO. *Blum*, 235 Ill. 2d at 32. The savings clause does not afford Lauretta another opportunity to formulate a method of apportionment which will entitle her to a greater share of the pension benefits than what was originally agreed to in the parties' marital settlement agreement and QDRO. However, an appropriate qualified Illinois domestic relations order is required to direct the pension fund to pay Lauretta her share of the benefits.

¶ 37                                         CONCLUSION

¶ 38     The trial court's findings that Lauretta should not receive more benefits than she agreed to in the original settlement agreement is affirmed. However, the case is remanded for the entry of an appropriate qualified Illinois domestic relations order spelling out the terms of the original settlement agreement and initial QDRO.

¶ 39     Affirmed and remanded with instructions.

¶ 40     JUSTICE GARCIA, dissenting:

¶ 41     In the postdecree proceedings below, the petitioner moved to have a qualified Illinois domestic relations order (QILDRO) entered when the respondent's pension fund refused to recognize the qualified domestic relations order that was entered with the 1988 judgment of dissolution of marriage. As I read the majority, we are unanimous in concluding that the circuit court erred in not entering a QILDRO. Absent a duly entered QILDRO for this court to review, I see nothing to affirm. We review the judgment of the circuit court, not its reasoning. *Devoney v. Retirement Board of the Policemen's Annuity & Benefit Fund*, 199 Ill. 2d 414, 422 (2002) (the function of a reviewing court is to determine whether the lower court

-9-

reached the right decision).

¶ 42       Our remand to the circuit court of Cook County should be for the entry of a QILDRO in accordance with the 1988 judgment of dissolution of marriage. After a QILDRO is entered, should the petitioner disagree with its terms, she can appeal. We can then review the division of the pension benefits between the respondent and the petitioner and, depending on the calculations, affirm or reverse.

¶ 43       Accordingly, I dissent from that portion of the opinion that affirms the order denying the petitioner's "motion for entry of a QILDRO" (*supra* ¶ 36).